UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 10-4170 (PJS/FLN)

Theresa A. Hill,

        Plaintiff,

      v.                            **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

_____

Edward C. Olson, Esq., for Plaintiff

Lonnie F. Bryan, Assistant United States Attorney, for Defendant
_____
_____

Plaintiff Theresa Hill seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her application for disability insurance benefits ("DIB"). See 42 U.S.C. § 405(g). The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g). The parties submitted cross-motions for summary judgment. (Doc. Nos. 14, 22). For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be granted and Defendant's motion for summary judgment be denied.

## I.   INTRODUCTION

Plaintiff protectively filed applications for DIB on August 13, 2007, and on October 11, 2007, alleging disability beginning August 1, 2000. (Tr. 112-22).  Her date last insured was September 30, 2002.  (Tr. 8).  Plaintiff's application was denied initially and upon reconsideration.  (Tr. 48-55, 63-65).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held on January 21, 2010.  (Tr. 66-67, 17-42).  On March 18, 2010, the ALJ issued a decision denying Plaintiff's claims.  (Tr. 5-16).  The Appeals Council denied Plaintiff's request for review on September 20, 2010 (Tr. 2-4), making the ALJ's decision final for purposes of judicial review.  See 20 C.F.R. § 404.981. Plaintiff commenced this action on October 7, 2010, seeking judicial review of the Commissioner's decision.

## II.   STATEMENT OF FACTS

### A.   Background

Plaintiff alleges disability from back injury with pain, hip pain, drop foot,[1] loss of balance, numbness, and trouble concentrating.    (Tr. 156, 194).  Plaintiff's birthday is September 20, 1958, and she was 41-years-old on the onset date, August 1, 2000.  (Tr. 115).  She obtained a GED at age 40, and she has past work experience as a driver.  (Tr. 22, 211).  Plaintiff quit working due to her medical condition in August 2000.  (Tr. 157).

---

[1] Dropfoot, also called footdrop, is partial or total inability to dorsiflex the foot, as a consequence of which the toes drag on the ground during walking. *Stedman's Medical Dictionary* 698 (Lippincott Williams & Wilkins 27th ed. 2000).  Dropfoot has many causes including disorders of the central nervous system, motor unit, tendons and bones.  (Id.)

2

Plaintiff has a history of car accidents and work injuries leading up to her alleged disability date of August 1, 2000.  Her first car accident was in 1979, when she hurt her neck and lower back, with pain going into her legs and right shoulder.  (Tr. 729.)  Her symptoms persisted, but a CT scan in 1983 showed only a slight disc bulge at L5-S1 and no significant abnormalities.  (Id.)  Plaintiff was treated conservatively and "did quite well," until an accident in 1984 caused significant cervical strain, and she was out of work for two years.  (Id., 470)  She had headaches, neck and shoulder pain through 1988.  (Tr. 729).  In 1986, Plaintiff was in a car that hit a deer.  (Id.)

Plaintiff's first work injury was in 1988, when she slipped and fell on ice, landing on her left hip and lower back.  (Tr. 729-30).  In January 1989, an MRI of her lumbar spine showed right-sided disk herniation with impingement on the right S1 nerve root.  (Tr. 730).  Her left leg symptoms were musculoligamentous in nature.  (Id.)  Plaintiff was awarded 9% permanent partial disability for her 1988 work injury.  (Id.)

In April 1996, without an aggravating incident, Plaintiff had an acute flare of low back pain and radiation down the right leg with no improvement from conservative treatment.  (Tr. 730-31).  Plaintiff's pain was recalcitrant, "severely narcotic depressed or dependent" at that time.  (Tr. 479).  Plaintiff underwent a laminectomy on April 14, 1996 "to free the L5-S1 nerve roots and remove the herniated L5-S1 disc."  (Tr. 732).  She returned to work full time on June 20, 1996.  (Tr. 733.)

Plaintiff suffered another work injury in April 1999, when she slipped and fell on a running board of a passenger van, landing on her left shoulder and the left side of her neck.  (Tr. 630).  An MRI of her neck showed a C5-6 disc protrusion, and an MRI of her left shoulder showed a possible small labral tear.  (Id.)  Plaintiff's pain increased over time,

despite her use of Tylenol 3, Valium and Vioxx.  (Tr. 630-31).  Dr. Thomas Murphy, a neurologist, concluded Plaintiff's arm pain was not radicular in nature, and conservative treatment was appropriate, but his opinion was not definitive because he had not reviewed MRI scans.  (Tr. 632).

In January 2000, Plaintiff fell and twisted her right ankle.  (Tr. 396).  She was placed in a cast, which was removed on March 9, and she returned to work full-time on April 3, 2000.  (Tr. 390-92).  Plaintiff continued to be treated for neck and arm pain from her April 1999 accident through September 2000.  (Tr. 376).

On October 23, 2000, Plaintiff saw Dr. David Holth, her longtime primary care physician, and complained of pain in her back, knees and ankles, which was present for years, but much worse recently.  (Tr. 386).  On examination, Plaintiff was teary eyed and anxious, with pain over the joints and slight edema.  (Id.)

Plaintiff returned to Dr. Holth on November 6, 2000, reporting that she fell on some leaves on November 3, causing increased pain in her back and legs.  (Tr. 375).  On examination, Plaintiff was in obvious discomfort, with difficulty standing in one place, tender with moderate spasm in the lumbar region, very limited lumbar range of motion, positive straight leg raise test, and hypoactive but equal lower extremity reflexes.  (Id.) Dr. Holth opined Plaintiff was unable to work, and he prescribed Percocet and Indocin for pain. (Id.)

A week later, Plaintiff had not improved, and she was admitted to Unity Hospital for treatment and evaluation.  (Tr. 311-12.)  An MRI of Plaintiff's lumbar spine on November 15, 2000 indicated:

4

> small to moderate sized posterior central and right paracentral disc protrusion at L5-S1 similar in appearance to the prior postsurgical MRI scan dated 2/26/97.  Again, this causes slight dorsal displacement of the right S1 nerve root and is in contact with the left S1 nerve root which could be slightly compressed. There is some degree of neural foraminal narrowing bilaterally at this level.   The other lumbar disc levels are otherwise unremarkable other than small posterior disc bulge at L4-5.

(Tr. 242-43.)  Dr. David Kraker recommended surgery because he "felt there was extensive fibrosis, and that the nerve root may be tethered and essentially her discomfort could be due to the disk herniation." (Tr. 233).  On November 22, 2000, Dr. Kraker performed "redo laminectomy right L5-S1 with lysis of adhesions, redo diskectomy right L5-S1, injection of Celestone." (Id.)   Upon discharge from the hospital, Plaintiff's restrictions were to wear a corset at all times, no driving for two weeks, and  no lifting more than 5-10 pounds until further evaluation.  (Tr. 235-36).

Plaintiff had a post operative MRI of the lumbar spine on January 25, 2001, indicating:

> there is a recurrent or persistent low signal intensity central disc herniation, which underlies both S1 nerve roots.  On the nonoperated left side, there is mild to moderate impingement on the traversing Left S1 nerve root.  On the right, the disc underlies the expanded nerve root sheath . . . [T]here is an indistinct visualization of the posterior margin of the disc and the right S1 nerve root.  The nerve root is in a normal position and is not displaced dorsally and therefore, this is felt to be perineural fibrosis rather than a small indistinct high signal intensity recurrent disc herniation.  The exam in not entirely definitive, however because of the similarity in signal intensity. There is a moderately severe right-sided front-back lateral spinal stenosis of the very medial aspect of the right L5-S1 intervertebral nerve root canal due to prominent focal thickening of the ligamentum flavum which projects into the dorsal aspect of the intervertebral nerve root canal to produce moderately severe compression of exiting right L5 nerve root ganglia.

(Tr. 323-24.)

When Plaintiff followed up with Dr. Kraker on January 31, 2001, she reported constant back pain and occasional severe shooting pain down the right leg. (Tr. 249). Dr. Kraker noted that Plaintiff's obesity probably contributed to her back pain, but she had cut back on her smoking. (Id.) Dr. Kraker recommended Neurontin, a Medrol Dosepak, pool therapy, weight loss, and that Plaintiff remain off work because she was not able to sit. (Tr. 249-50). If her leg discomfort did not improve over time, Dr. Kraker recommended fusion because Plaintiff's right-sided leg pain could be caused by moderately severe foraminal stenosis and instability at L5-S1. (Tr. 249-50).

Plaintiff next saw Dr. Holth on February 25, 2001, for severe back pain. (Tr. 371). Plaintiff was in distress with movement, and her lumbar range of motion was quite limited. (Id.) Plaintiff would be preparing for surgery by trying to lose weight and quit smoking. (Id.) Two months later, Plaintiff had increased low back pain radiating down both legs intermittently, but she needed to improve muscle tone and lose weight before surgery. (Tr. 370). Dr. Holth recommended swim therapy at the Courage Center. (Id.) Plaintiff continued to use Tylenol 3 intermittently during the day and Vicodin at night to help her sleep. (Id.)

After Plaintiff had fifteen physical therapy sessions at the Courage Center, Physical Therapist Susan Keane noted Plaintiff did a little better on most days, but she still fell down once a week, and only improved her conditioning for mild aerobic exercise from two minutes to ten minutes. (Tr. 218). Plaintiff admitted she would probably have to face surgery. (Id.)

When Plaintiff was examined by Dr. Holth in June 2001, she was overweight, in distress with change of position, walking with a slight limp, tender in the neck but with near normal cervical range of motion, tender lumbar spine with limited range of motion, and straight leg raise test was positive in the supine position.  (Tr. 367).  Plaintiff's low back pain continued to be severe through September 2001, and she was in obvious discomfort with movement.  (Tr. 364).

On October 24, 2001, Dr. Kraker noted Plaintiff's chronic back pain was still considerable, despite physical therapy, which provided short-term pain relief.  (Tr. 246).  Plaintiff had lost 40-45 pounds and cut her smoking to a half pack a day, using Wellbutrin for smoking cessation.  (Id.)  Dr. Kraker noted smoking can affect fusion; nevertheless, the fusion rate was high for anterior fusions, even for smokers.  (Id.)  An MRI on October 4, 2001 showed severe disc degeneration but no evidence of significant nerve compression.  (Id.)  Dr. Kraker opined Plaintiff was a candidate for anterior/posterior fusion.  (Id.)  He recommended that Plaintiff remain off work pending surgery.  (Id.)

On January 7, 2002, Dr. Paul Cederberg of Minnesota Orthopedics examined Plaintiff.  (Tr. 230-32).  Plaintiff was somewhat overweight and deconditioned, with mildly poor balance, difficulty walking heel to toe, diminished reflexes at the knees and ankles, give away strength in the left lower extremity, no pain with hip rotation, diffuse tenderness in the low back and sacral area, and straight leg raise test was negative to fifty degrees.  (Tr. 231).  Dr. Cederberg reviewed the MRIs, and his impression was recurrent disk herniation at L5-S1 with bilateral radiculitis.  (Tr. 231-32).  Dr. Cederberg opined that Plaintiff's weight was now within a reasonable range to withstand anterior/posterior disk

fusion. (Tr. 232). He gave Plaintiff a 50% prognosis for improvement, and opined Plaintiff should reach maximum medical improvement six months after surgery. (Id.)

Dr. Kraker performed Plaintiff's surgery on April 8, 2002, consisting of anterior diskectomy and fusion at L5-S1, redo laminectomy right L5 and right S1, with right S1 foraminotomy, and posterior spinal fusion L5-S1. (Tr. 239-40). Two weeks later, Dr. Kraker noted Plaintiff's progress was very slow, with more leg symptoms after surgery. (Tr. 244). He increased Plaintiff's Vioxx and continued her on Percocet and Oxycontin. (Id.) Dr. Kraker recommended increased ambulation without using a walker. (Id.) He also recommended that Plaintiff remain off work, and he would reevaluate in three months. (Id.) Plaintiff was hospitalized for several days in May 2002, when symptoms from a viral syndrome aggravated her chronic back pain. (Tr. 257-58, 274).

At the end of July 2002, Plaintiff's symptoms were moderate discomfort, numbness on the top of her feet, some intermittent discomfort of her left thigh, and some episodes of loss of bladder control. (Tr. 333). Dr. Kraker prescribed Vistaril and recommended a urology consultation. (Id.) X-rays showed the fusion was not yet completely solid, and Dr. Kraker kept Plaintiff off work. (Id.) A CT scan of Plaintiff's lumbar spine on September 13, 2002 showed solid anterior fusion. (Tr. 319).

Plaintiff's date last insured was September 2002, but the Court will briefly summarize Plaintiff's medical treatment after that date. When Plaintiff saw Dr. Kraker on May 7, 2003, she reported progressively more discomfort in her back and legs, parasthesias down her legs after sitting 10-15 minutes, increased back pain with walking, and falling after her leg gave out. (Tr. 847). On examination, there was tenderness over the hardware from her

8

surgery, and x-rays showed the fusion was probably solid.  (Id.)  Dr. Kraker recommended hardware removal.  (Id.)

In February 2004, Plaintiff wanted to reschedule her hardware removal.  (Tr. 844.) Plaintiff was again deconditioned from lack of exercise, and Dr. Kraker recommended pool therapy.  (Id.)  Dr. Kraker performed the hardware removal on March 1, 2004.  (Tr. 788-89). In addition to moderate back discomfort, Plaintiff developed groin pain on the left side and weakness in the left leg in the months following surgery.  (Tr. 841, 833.)  Dr. Kraker kept Plaintiff off work.  (Id.)

Plaintiff had another MRI of her lumbar spine on June 17, 2004, showing:  moderate L4-5 disc degeneration with moderate central stenosis and compression of the thecal sac; bilateral subarticular traversing proximal L5 nerve root impingement due to a small dorsal disc herniation with accompanying circumreferential high intensity annular fissure, along with moderate thickening of ligamentum flavum; and mild L2-3 disc herniation.  (Tr. 860-61).  Dr. Kraker believed the majority of pain was from L4-5, noting Plaintiff had fallen four times when her leg gave out.  (Tr. 828).  In October 2004, Plaintiff had no improvement from an epidural injection.  (Tr. 855).  In February 2005, Plaintiff had pain down both legs aggravated by very little activity, and she had drop foot on the right side with numbness. (Tr. 970).

In May 2005, Plaintiff told Dr. Kraker she could not live with the pain.  (Tr. 823).  Her MRI the next month indicated disc protrusion in conjunction with thickening of the ligamentum flavum resulting in moderate spinal canal compromise with moderate bilateral neuroforaminal narrowing.  (Tr. 822).  At that time, Plaintiff's symptoms in the right leg were much worse.  (Tr. 821).  Dr. Kraker recommended laminectomy, discectomy and fusion at

9

L4-5, which he performed on October 24, 2005.  (Tr. 821, 946-47).  A little over a year later, on January 11, 2007, Plaintiff had the hardware removed with redo laminectomy on the left at L4-5 and left L5 foraminotomy.  (Tr. 937-38).  Dr. Kraker never lifted Plaintiff's work restriction after any surgery.  (Tr. 244, 246, 249-50, 333, 820, 833, 1016, 1037, 1038, 1040).

After Plaintiff's hearing before an ALJ, Dr. Kraker wrote a letter to Plaintiff's attorney on March 10, 2010.  (Tr. 1041).  He stated Plaintiff had been under his care since he performed her surgery on November 22, 2000.  (Id.)  Dr. Kraker reviewed the Social Security Administration's ("SSA") definition of sedentary work, and opined that Plaintiff never met the requirement for returning to sedentary work from November 2000 to the present, and she was totally disabled.  (Id.)

### B.    Administrative Hearing

Plaintiff testified at an administrative hearing before ALJ Diane Townsend-Anderson on January 21, 2010.  (Tr. 17).  Plaintiff testified as follows.  She lived with a significant other, and her children were all over the age of eighteen.  (Tr. 22).  She obtained a GED at age 40 and had no other vocational training.  (Id.)  Her hobby was fishing, and she lived in a cabin on a lake but did not fish much.  (Tr. 23).  She also liked to sew.  (Tr. 25).  Every other day, she drove into town to shop or walk around.  (Id.)  In the summer, she would walk about a half mile every day.  (Tr. 23-24).  Her other activities were reading and using a computer to read news and play games.  (Tr. 24).  She went to movies a couple times a month.  (Tr. 24-25).  Her children visited her once a week, and she visited her boyfriend's mother twice a month.  (Tr. 25).

Plaintiff stopped working as a driver in August 2000, because she was having a hard time getting in and out the passenger van and driving for long hours. (Tr. 26). She did not work since then because her surgeon never released her for work. (Tr. 27). After each surgery, she lost more functional ability. (Tr. 28). For example, she cannot balance and tends to fall down. (Id.)

Plaintiff walked three blocks after parking her car before the hearing, and she needed to sit after that. (Tr. 31). Most of her pain was from the waist down, and she had numbness in both legs and feet. (Tr. 31-32). Her numbness gradually got worse with each surgery. (Tr. 32).

Dr. Robert Beck, who testified as a medical expert ("ME"), stated that with Plaintiff's multiple surgeries and radiculopathy, she probably met listing 1.04[2] as of her surgery on March 7, 2004. (Tr. 32-33). Prior to March 2004, Dr. Beck opined Plaintiff would have been limited to sedentary work with no climbing of ropes or ladders, and she would need to change positions at will. (Tr. 34). Dr. Beck agreed with Plaintiff's counsel that Plaintiff's November 2000 surgery removed the nerve root impingement but there was nerve root contact again, leading to surgery in April 2002. (Tr. 34-35). Fusion on one side was not solid on September 13, 2002. (Tr. 35-36). Plaintiff's counsel asked whether Plaintiff could have equaled listing 1.04 at that time or with the second surgery in April 2002. (Tr. 36).

---

[2] Listing 1.04A is met under the following conditions: Disorders of the spine resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test. 20 C.F.R. § 404, Subpart P, Appendix 1, § 1.04A.

Dr. Beck stated, "[i]t could be limiting, but maybe not disabling."  (Id.)  Dr. Beck confirmed

it was his testimony that Plaintiff did not equal listing 1.04 during that period.  (Id.)

Plaintiff's counsel then asked Dr. Beck whether Plaintiff would have a recovery

period restricted to less than a sedentary level after surgery in 2000, and Dr. Beck agreed.

(Id.)  Dr. Beck agreed there were objective signs that Plaintiff still had a back problem after

her first surgery, which led to a second surgery in April 2002, without solid fusion at that

time.  (Tr. 37).  Dr. Beck agreed that a fusion which was not solid could cause pain.  (Tr.

38).  Counsel asked whether, between April 2002 and March 2004, Plaintiff's condition

could have caused pain that would have restricted her to less than a sedentary exertional

level.  (Tr. 38).  Dr. Beck responded, "that case could be made, yes."  (Id.)

Mitchell Norman testified as a vocational expert ("VE") at the hearing.  (Tr. 39).  The

ALJ asked Norman whether a person of Plaintiff's age, education, work history, obesity,

back pain and surgical history could perform her past work within the following limitations:

lifting and carrying ten pounds occasionally, five frequently; perform all functional aspects

of sedentary work but no heights, ladders, scaffolding, foot pedal manipulations or work on

uneven ground, and requirement to change positions at will at the workstation.  (Id.)

Norman testified such a person could not perform Plaintiff's past work but could perform

other work in the regional economy, including order clerk, Dictionary of Occupational Titles

("DOT") No. 209.567-014, 6,500 jobs in Minnesota; lens inserter, DOT No. 713.687-026,

1,100 jobs in Minnesota; and bonding machine operator, DOT No. 726.685-066, 1,300 jobs

in Minnesota.  (Tr. 40).

The ALJ posed a second hypothetical question involving a similar individual, whose

pain prevented her from attending work with persistence and caused absences from work

more than two days a month.  (Id.)  Norman testified there would be no work in the regional

or national economy for such a person.  (Id.)  Plaintiff's counsel posed a final hypothetical

question, adding to the limitations in the first hypothetical that the individual could only sit

four out of eight hours and only stand four out of eight hours in a day, and would need

frequent unscheduled breaks and would be unable to attend to ongoing tasks on a frequent

basis.  (Tr. 40-41).  Norman stated such a person could not meet an employer's production

requirements, and the person would not be employable.  (Tr. 41).

**C.    ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2002.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 1, 2000 through her last date insured of September 30, 2002 (20 CFR 404.1571 *et seq*).

3.    Through the date last insured, the claimant had the following severe impairments: obesity; degenerative disc disease of the lumbar spine; status post L5-S1 laminectomy, redo laminectomy and fusion; and chronic pain (20 CFR 404.1520(c)). . . .

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526). . . .

5.    After careful consideration of the entire record, including the credible testimony of the impartial medical expert, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) as lifting and carrying 10 pounds occasionally, and 5 pounds frequently, standing and/or

walking two hours out of an eight hour work day, and sitting 6 hours of an 8 hour day, allowing for a sit/stand option at will at the work station, and avoiding the climbing of ladders and ropes, work at heights, operation of foot pedals, and ambulation on uneven ground. . . .

6.      . . . [T]he claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity. . . .

7.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565). . . .

8.      The claimant was born on September 20, 1958 and was 44 years old, which is defined as a younger individual age 18-44, on the date last insured.   (20 CFR 404.1563).

9.      The claimant has at least a high school education and is able to communicate in English.  (20 CFR 404.1564).

10.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)). . . .

12.     The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2000, the alleged onset date, through September 30, 2002, the date last insured. (20 CFR 404.1520(g)).

(Tr. 10-16).

### III.   CONCLUSIONS OF LAW

**A.     Standard of Review**

Disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   20 C.F.R. §§ 404.1505(a), 416.905(a).   In making a disability determination, the ALJ must follow a sequential evaluation process which applies to both physical and mental disorders.   20 C.F.R. §§ 404.1520, 416.920 outline the five-step sequential process used by the ALJ to determine whether a claimant is disabled.   At the first step, the ALJ must consider the claimant's work history.   (<u>Id.</u>)  At the second step, the ALJ must consider the medical severity of the claimant's impairments.   (<u>Id.</u>)  At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or medically equal one of the listings in Appendix 1 to Subpart P of the regulations. (<u>Id.</u>)  If the claimant's impairment does not meet or equal one of the listings in Appendix 1, at step four, the ALJ must make an assessment of the claimant's residual functional capacity ("RFC") and the claimant's ability to perform her past relevant work.   (<u>Id.</u>)  If the claimant can perform her past relevant work, the ALJ will find that she is not disabled.   (<u>Id.</u>) If the claimant cannot perform her past relevant work, the "burden of proof shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and second, that other such work exists in substantial numbers in the national economy."   <u>Cunningham v. Apfel</u>, 222 F.3d 496, 501 (8th Cir. 2000).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether substantial evidence on the record as a whole supports the decision.  42 U.S.C. 405(g); Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).  In determining whether evidence is substantial, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  Moore ex rel Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence, and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision.  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).

**B.    Issues**

Plaintiff contends the ALJ's RFC opinion is not based on substantial evidence because the ALJ did not place proper weight on Dr. Kraker's opinion.  Plaintiff recognized the ALJ never had Dr. Kraker's March 2010 RFC opinion but argues the Appeals Council should have remanded to the ALJ to consider the new evidence.  In support of Dr. Kraker's opinion, Plaintiff points out that Dr. Kraker examined her twenty-five times and performed five surgeries on her between November 22, 2000 and March 2010.  Plaintiff asserts the case should be remanded for the ALJ to evaluate Dr. Kraker's opinion, because the hypothetical question posed to the VE did not accurately describe Plaintiff's functional limitations.

In response, Defendant argues the Court may only consider Dr. Kraker's March 2010 opinion for the limited purpose of determining whether Plaintiff is entitled to a remand under sentence six of 42 U.S.C. § 405(g), because the evidence was not before the ALJ at the time of her decision. Defendant asserts Plaintiff has not attempted to meet the burden for a sentence six remand, and she could not because the evidence is not material. Defendant contends the ALJ reasonably afforded significant weight to the medical expert's opinion because the ME reviewed the entire record; he had pertinent medical expertise and familiarity with the regulations.

### 1. Review of Evidence Submitted After the Hearing Before the ALJ

Defendant asserts an incorrect standard for consideration of Dr. Kraker's March 2010 opinion, due to the faulty conclusion that the evidence was outside the record before the Commissioner. See Delrosa v. Sullivan, 922 F.2d 480, 483-84 (8th Cir. 1991) ("The Social Security Act generally precludes consideration on review of evidence outside the record before the Secretary," unless the new evidence is material and the claimant demonstrates good cause for not submitting it at the administrative level) (internal citations omitted). In this case, the Appeals Council made Dr. Kraker's March 2010 letter part of the record, but declined review of the ALJ's decision. On page one of the Notice of Appeals Council Action, the Notice provides, "[i]n looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council." (Tr. 2). The Order of Appeals Council states that the Appeals Council

17

received additional evidence "which it is making part of the record" including the "Statement from Dr. David P. Kraker dated March 10, 2010." (Tr. 1).[3]

Under such circumstances, where the evidence is contained in the administrative record but was not considered by the ALJ, the reviewing court is charged with "determine[ing] how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." Jenkins v. Apfel, 196 F.3d 922, 924 (8th Cir. 1999). In Mackey v. Shalala, the Eighth Circuit explained:

> When the Appeals Council has considered material new evidence and nonetheless declined review, the ALJ's decision becomes the final action of the Secretary. We then have no jurisdiction to review the Appeals Council's action because it is a nonfinal agency action. *See Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). At this point, our task is only to decide whether the ALJ's decision is supported by substantial evidence in the record as a whole, including the new evidence deemed material by the Appeals Council that was not before the ALJ. As we have noted, "this [is] a peculiar task for a reviewing court." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994). Some circuits simply refuse to consider such tardy evidence as basis for finding reversible error. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). But we do include such evidence in the substantial evidence equation.

---

[3]    20 C.F.R. § 404.970(b) Cases the Appeals Council will review.

> (b) if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the [ALJ] hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the [ALJ] hearing decision. It will then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record.

47 F.3d 951, 953 (8th Cir. 1995).  Therefore, the Court will review the ALJ's decision and determine how the ALJ would have weighed Dr. Kraker's March 2010 RFC opinion, if it had been presented at the hearing.

## 2.  Evaluation of the Medical Opinions

Dr. Kraker was Plaintiff's spine surgeon and frequently followed her progress from November 2000 through at least her last surgery in January 2007.  In March 2010, Dr. Kraker opined Plaintiff never met the requirements for returning to sedentary work:  lifting and carrying ten pounds occasionally and five pounds frequently, standing and/or walking two hours out of eight, and sitting six hours out of eight, from November 2000 to the present.  (Tr. 1041); and see 20 C.F.R. § 1567(a) (defining sedentary work).  Because Dr. Kraker was Plaintiff's treating physician, the ALJ would have reviewed his March 2010 RFC opinion to determine if it was entitled to controlling weight.  See 20 C.F.R. § 1527(d)(2) (treatment relationship).  If the ALJ finds that "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the ALJ] will give it controlling weight."  Id.; Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011).  "A treating physician's opinion does not automatically control", however, because the ALJ must evaluate the record as a whole. Id. (quoting Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).  "'An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" Id. (quoting Goff, 421 F.3d at 790) (internal quotation marks omitted)).

19

If the ALJ had considered Dr. Kraker's March 2010 RFC opinion, she would not have found any inconsistent opinions by Dr. Kraker; he kept Plaintiff off work continuously beginning when she scheduled her 2000 surgery through at least her 2007 surgery. (Tr. 244, 246, 249-50, 333, 820, 833, 1016, 1037, 1038, 1040).   To give more weight to Dr. Beck's RFC opinion, the ALJ would have had to find that it was supported by better or more thorough medical evidence or that Dr. Kraker's opinion was inconsistent with other substantial evidence in the case record.

Dr. Beck testified that during the relevant time frame, Plaintiff would have been limited to sedentary work with no climbing of ropes or ladders, and the ability to change positions at will.  (Tr. 34).  Dr. Beck also agreed there were objective signs that Plaintiff still had a back problem after her surgery in 2000, leading to a second surgery in April 2002, without solid fusion at that time, and that a fusion which was not solid could cause pain. (Tr. 37-38).  Dr. Beck testified the "case could be made" that between April 2002 and March 2004, Plaintiff's condition could have caused pain that would have restricted her to less than a sedentary exertional level.  (Tr. 38).  He was not asked to and did not explain  why he instead believed Plaintiff could have performed sedentary work with a sit/stand option at will and no climbing ropes and ladders.  Both physicians agreed Plaintiff had a condition that could cause pain, but neither physician knew for sure how much pain, and neither opinion was supported by better or more thorough medical evidence or explanation by the physician.

Unless, there was substantial evidence in the record that was inconsistent with Dr. Kraker's opinion, the ALJ would have granted his opinion controlling weight under 20 C.F.R. § 1527(d)(2), out of deference to a treating physician's special knowledge of the

claimant.  The ALJ stated that she placed significant weight on the medical expert's opinion because he had the opportunity to review the entire record, he had medical expertise, and he was familiar with the regulations.  (Id.)  The ALJ also said she relied on the claimant's treating sources "that are supported by objective findings."  (Id.)  The ALJ listed the following reasons for granting significant weight to Dr. Beck's RFC opinion: claimant noted an improvement in leg pain and ability to ambulate after surgery in November 2000; her recovery was complicated by tobacco use, despite repeated advice to quit; claimant attended pool therapy with good activity levels and lost significant weight, which suggests her overall improvement in functioning; she improved her balance and strength in her core and back; her pain was reduced to "moderate discomfort" within months of her April 2002 surgery; in September 2002, her CT scan showed solid anterior fusion without apparent hardware complications; and Plaintiff used pain medications, "none of which was heavy narcotic type," with no significant side effects of medication.  (Id.)  Thus, the ALJ did not place great weight on the opinion of Dr. Kraker "allowing the claimant to remain off work." (Id.)

The ALJ found Plaintiff's subjective complaints not entirely credible because she was able to walk half a mile daily, and the frequency of her falls were not well documented, with only one or two falls noted in Dr. Holth's records.  (Id.)  The ALJ also found Plaintiff's ability to drive to town, visit family and see movies a couple times a month inconsistent with disability.  (Id.)

The Court does not find substantial evidence in the record as a whole to support the ALJ's decision.  First, the ALJ's comment that Plaintiff's pain medications were not a "heavy narcotic" type is unavailing.  During the relevant time period, in various  combinations,

Plaintiff used Tylenol 3, Vicodin, Percocet and Oxycontin, all narcotic medications indicated for a range of pain levels, up to moderately severe pain.[4]   Use of these types of medications typically support the credibility of a claimant's subjective complaints of pain. See e.g. Bowman v. Barnhart, 310 F.3d 1080, 1083 (8th Cir. 2002).

Second, although Plaintiff did not visit a doctor every time she fell down, she reported frequent falls during the period from 2001 to 2003, due to weakness or her leg giving out.  (Tr. 218, 847).  Third, the activities the ALJ cited as inconsistent with disability were activities Plaintiff engaged in at the time of the hearing in 2010, not necessarily during the relevant time period of August 2000 to September 2002, which the ALJ did not specifically ask about at the hearing.

Furthermore, in determining Plaintiff's RFC, the ALJ relied on Plaintiff's improved leg pain and ability to walk after her November 2000 surgery.  The ALJ also relied on Plaintiff's post-surgical improvement from pool therapy and weight loss.   While these facts cited by the ALJ are true, they present an incomplete picture.  Plaintiff had some immediate relief with surgery in November 2000, but by the end of January 2001, she reported constant back pain and occasional severe shooting pain down the right leg.  (Tr. 249).  An MRI of her lumbar spine on January 25, 2001, showed impingement of a nerve root, a significant indicator of pain.  (Tr. 323-24.)  In February 2001, Plaintiff was in distress with movement,

---

[4]  Tylenol 3 is Tylenol with codeine, and is indicated for the relief of mild to moderately severe pain.  *Physician's Desk Reference* ("*PDR*") 254 (59th ed. 2005). Vicodin is a semi-synthetic narcotic analgesic indicated for treatment of moderate to moderately severe pain.  *PDR* at 526.  Percocet, a combination of oxycodone and acetaminophen, is a semi-synthetic opioid, indicated for the relief of moderate to moderately severe pain.  (Tr. 1222-23).

and her lumbar range of motion was quite limited.  (Id.)  She was preparing for another surgery by trying to lose weight and quit smoking.  (Id.)  Two months later, Plaintiff had increased low back pain radiating down both legs intermittently, but she needed to improve muscle tone and lose weight before surgery.  (Tr. 370).

The ALJ noted that in addition to weight loss, Plaintiff's pool therapy improved her strength and decreased her pain.  This ignores the fact that Plaintiff's pain relief from pool therapy was short-term, and she improved her aerobic conditioning only enough to do aerobic activity for ten minutes.  (Tr. 218, 246).  When Plaintiff was discharged from physical therapy in June 2001, she still believed she would need another surgery.  (Tr. 218).  In October 2001, Dr. Kraker noted Plaintiff's pain relief from therapy was short-term, and he believed she was a candidate for anterior/posterior fusion.  (Tr. 246).  An independent medical examiner, Dr. Paul Cederberg, agreed with Dr. Kraker's recommendation for surgery, based on Dr. Cederberg's review of Plaintiff's MRIs, which indicated recurrent disk herniation at L5-S1 with bilateral radiculitis. (Tr. 231-32).  Plaintiff's surgery was performed in April 2002, and the fusion was at least partially solid in September 2002.  (Tr. 239-40, 35-38, 319-333.)  In sum, Plaintiff complained of severe pain, which was supported by objective evidence of nerve root impingement in November 2000 and January 2001, without significant relief before Plaintiff's April 2002 surgery and subsequent recovery period.  Contrary to the ALJ's decision, substantial evidence in the record as a whole supported Dr. Kraker's opinion that Plaintiff was unable to sustain competitive employment at even a sedentary level, at least from November 2000 through September 2002. Depending on age, education and vocational factors, this might establish a closed period of disability.  See Harris v. Sec'y of Dept. of Health and Human Svcs, 959

23

   CASE 0:10-cv-04170-PJS-FLN   Document 24   Filed 11/07/11   Page 24 of 25

F.2d 723, 724 (8th Cir. 1992) ("Under 20 C.F.R. § 404.316 (1990), the [Commissioner] can award Social Security disability benefits either on a continuing basis or for a 'closed period.'")

The ALJ did not discuss the medical evidence after Plaintiff's date last insured, September 2002. Because the Court finds that substantial evidence in the record supports Dr. Kraker's RFC opinion for less than sedentary work from November 15, 2000 through at least September 2002, the case should be remanded to the ALJ. The ALJ should consider the medical evidence after September 2002, for the purpose of determining whether the record as a whole supports a period of disability or continuing disability benefits and for further vocational analysis.

## IV.    RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment (# 14) **be GRANTED**;

2.    The case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion;

3.    Defendant's Motion for Summary Judgment (# 22) **be DENIED**;

4.    The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**

DATED: November 4, 2011.          *s/ Franklin L. Noel*
                                  FRANKLIN L. NOEL
                                  United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before November 21, 2011, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words.  A district court judge shall make a de novo review of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.